Good morning, Your Honors. My name is Courtney McDermott, appearing for the Law Office of Robert Lewis on behalf of Petitioner Felipe Hernandez-Garcia. This is a classic asylum case. The issues in this case are very straightforward. The immigration judge erred in his legal determination that Petitioner was firmly resettled in Mexico. The judge erred when he failed to grant Petitioner asylum and withholding on humanitarian grounds. Additionally, the record does not support the immigration judge's determination that country conditions have changed to such an extent that Petitioner could return to Guatemala. The government didn't. How long had he been in Mexico? He had been in Mexico for 12 years, Your Honor. And you are claiming that the I.J. erred, couldn't have reasonably found that he was permanently settled there? Your Honor, that's correct. The reason why is because in all of the cases... I'm not permanent. Firm resettlement is a standard. I'm sorry, Your Honor? I misspoke. I said permanently resettled. The standard is firm resettlement. Correct, Your Honor. He was not firmly resettled, Your Honor, because he was never given any status in Mexico. And the regulation discusses the different kinds of privileges or different rights that a respondent or a petitioner has to have in a third country in order to be firmly resettled. He doesn't necessarily have to be a citizen or a legal permanent resident. However, he has to enjoy certain rights, which this petitioner did not. And the petitioners in the Ninth Circuit case law have all enjoyed the rights listed in the regulation, except for Chau where there's a complete absence of any description whatsoever. However, in this case, the petitioner rebutted the judge's finding with two pieces of evidence that he was firmly resettled. And the judge erred in failing to take that into consideration. Firm resettlement is a presumption, right? That's correct, Your Honor. That's what our cases teach, that if you're arguably colorably undisturbed for a period of time in a third country, that that gives rise to a presumption of firm resettlement. That's correct, Your Honor. And your argument is that that presumption was overcome by proof that Hernandez offered that that presumption should not obtain. What proof would you point to? Well, Your Honor, there's the respondent of the petitioner's testimony, where he testified that his children could not go to school in Mexico, which is one of the factors listed, that he had no right to travel, that he had no work permit, that he could not own land in Mexico, that he did not have any rights. But the standard is not whether you have equal rights with everybody else. That's correct. There's a presumption that you are left undisturbed in that country. I mean, if you come here as a refugee, you don't have equal rights with everybody. You become, especially if you don't become a citizen, you can't afford all sorts of things you can't do. And getting asylum with only a petition doesn't give you equal rights.  The question is, what has he done about the presumption that having been allowed to stay for 12 years, that he was likely to be deported after all that time? Well, Your Honor, you – The fact that he didn't enjoy all the rights of citizenship doesn't really help him any. Your Honor, he didn't say that he didn't enjoy all the rights of citizenship. He didn't enjoy any of the rights – Well, he said he couldn't own land, okay? That's correct. Well, that's fine. But owning land is not – the fact that he can't own land doesn't rebut the presumption. No. Owning land is only one factor. However, you – No, I don't think it's a factor at all. Yes, it is. It's in the regulation, Judge. It's what? It says property rights and whether the refugee received permission to hold property and enjoy other rights and privileges such as travel documentation that includes a right of entry or reentry, education, public relief, or naturalization ordinarily available to other residents in the country. But that goes to the question of whether he's going to be deported. Well, it goes to the question of whether he's firmly resettled. And as you yourself have stated, the asylum example, that's a perfect example in this country. An asylee in this country cannot vote and doesn't have all of the rights and privileges that I, as a U.S. citizen, have. However, an asylee does have the right to own land. An asylee does have a right to send their children to school. An asylee does have certain rights not to vote. He doesn't – an asylee doesn't have the whole bundle of rights and privileges of citizenship. However, an asylee does have certain rights that are all completely lacking for Mr. Hernandez-Garcia in Mexico. He didn't have the right to send his children to school. He didn't have the right to own property. He didn't have the right to entry or reentry or travel documentation. But what did he show? Whatever he presented, he was likely to be sent back to Guatemala if he stayed in Mexico. Well, Your Honor, he had no status in Mexico. He didn't have the right of entry or reentry. Didn't he have to stay on this particular little place where he was, farm or camp or? He was not in the refugee camp, Your Honor, because that was too restrictive on his liberty, because that was, as you are, I believe, implying that those people had curfews. They could only come and go at the person who was in charge of that camp's whim, essentially. How would his status in Mexico compare to the status of one of the 40 million undocumented aliens that are in this country? I believe they're fairly comparable. He had no rights of any kind, although actually undocumented aliens in this country at least can send their children to school. He didn't have that right either. So actually an undocumented person. I don't even know if the government of Mexico has such things. I know they have immigration problems, but was he subject to deportation or removal or something like that? Well, he wasn't in those proceedings, but certainly if he had been apprehended. Neither are the 40 million people who wash the sheets in hotels and clean the dishes in the restaurants and pick the lettuce at the airports and that sort of thing. None of them. And dig our graves when we die. None of them have that. But just in terms of status, if an official of the Mexican government had come to him and said, what right do you have to be here? His honest answer would be none. That's correct, Your Honor. Now, on the other hand, he stayed there for 12 years. That's true, Your Honor. Uninterrupted? He didn't leave Mexico until he came here. He was in Chiapas, which is an area that until the uprising in 1995, there wasn't a lot of, my understanding, activity there. There weren't refugee camps, for example, when he first arrived in 1982. Those were only established in 1990. So he was a non-entity in Mexico unless he had been picked up at the Immigration Service of Mexico, at which point he would have been deported because at that time the Mexican government was not a signature on the Geneva Conventions either, and I don't believe they had any procedures for granting asylum until much later. And that's submitted in the letter from the UN High Commission on Refugees that was submitted before the immigration judge, which he apparently disregarded. The immigration judge also erred in failing to find change when he found that there were changed country conditions because the evidence submitted by the Immigration Service did not support that there were changed country conditions. And even if they had, the petitioner certainly rebutted those with the volumes of documentation as well as his testimony that he did not believe that he could return to Guatemala, including over 100 pages. Yes, Your Honor. Is he surely more than political turbulence? I mean, I'm getting to the fact of the asylum. Is he surely more than, you know, he was in the wrong place at the wrong time? Oh, yes. Yes, Your Honor. He was secretary. He was in the leadership of the cooperative. He'd been summoned to the army barracks on at least two occasions. He didn't go because he was in Guatemala City working on cooperative business, however. Other leaders in the cooperative went to the army base in his stead, and they said that they saw his name on lists. Army lieutenants came to his house on at least two occasions and interrogated his wife about things like, well, what kind of food did he bring when he left the house, implying that he would be feeding the guerrillas, that he had this pro-guerrilla political opinion. Moreover, he was stopped and interrogated by an army lieutenant on one occasion where he was only saved by a vigil at the church, the Catholic church of over more than 100 villagers staying there to protect him. Also, his successor in the leadership of the cooperative was murdered, as was the treasurer in the cooperative, by the army. So as a cooperative leadership member, he was targeted for his imputed political opinion and his particular social group. Also, he was a catechist for the Catholic church, and as a ---- Was he roughed up? Was he roughed up? No, he was stopped and interrogated a couple of times about that as well. Was he arrested and confined for a long period of time, other than for questioning? No, Your Honor, he didn't go in for questioning, and they ---- Property destroyed? Yes, his property was burned to the ground. Along with everybody else? When they set fire to his entire village, they also burned down his property. So this is not a situation where they sort of went after him and they burned down the village while trying to burn his house? They were trying to kill ---- They had recently found a mass grave of over 1,000 bodies in the Puerto Pueblo area. But you have to ---- It seems to me if you're going to pursue that, if you're going to pursue the burning down of the village and the mass graves, you have to ---- I mean, it seems disconnected from his problems that he might have had on account that he was Secretary of the Corps. No, Your Honor, I don't believe so, because the ---- Burned down the village because he wouldn't give a loan to the ---- I mean, I understand. I understand what you're saying, but I think that there are two different ---- He was persecuted as being a member of the leadership of the cooperative, and other members of the leadership of the cooperative were murdered. Also, he was part of the Puerto Pueblo, and Hoxha v. Ashcroft states that if the group as a whole experienced extreme persecution, that the individual has to show slightly less persecution because it's implied that as a member of the whole, as a very discreet group, he would be persecuted. So it's both that he was in the leadership of the cooperative and members of the leadership of the cooperative were murdered, including his successor. Just separating out what happened to him individually on account of his being in the leadership of cooperative. Yes, he was summoned to the army barracks. He was interrogated. His name was seen on a list. He was actually taken into custody and questioned, at which point they could have beat him or killed him or strangled him or whatever, but they didn't. They let him go. Well, he wasn't actually in custody, sir. They didn't destroy his property. His property got destroyed as a result of this sort of thing that applied to everybody else. But if you just focus on the things that apply specifically to him, it doesn't sound to me like much happened. Well, he was one thing is he wasn't taken into custody. He was interrogated in a semi-public place. So it would have been more difficult to, you know, strangle him, although, you know, certainly they could have dragged him away kicking and screaming. You're right, Judge. The other thing, though, is that he was confronted by government officials. There were there a sufficient number, a sufficient force. They really said, oh, you know, you weren't there. You know, you escaped being taken into custody and doing whatever they were going to do to you. The army barracks, they could have grabbed him at that point, put him in a parry wagon. That's true. So this idea that he wouldn't have gotten away if he had only gone to the army barracks and if he hadn't been absent, you know, something terrible had happened to him, it's a little bit sort of undercut. I mean, they had him and they let him go. So what is it that, you know, in terms of asylum, does he even have as much as a threat? They call him up and they say, come in and talk to us. Is there anything more than that? Is there even a threat against him? Your Honor, given the political climate of the time, I believe that that was threatening. I believe that that was threatening, yes, Judge. And what do you have on the record? The political climate of the time, Your Honor. People who were summoned to the army barracks rarely left. Well, most of them did, right? It's not like everybody who got summoned to the army barracks remained there and was never heard from again. He was summoned and they caught him and they let him go. Well, Judge, he wasn't summoned to the – I mean, he was summoned to the army barracks, but when they interrogated him, it wasn't in the army barracks. Although, as you say, they could have put him on that. Was everybody who was summoned to the army barracks, none of them got away? Your Honor, my understanding is very few did get away. Well, I mean, we know some did because they reported that his name was on the list. They went, but their names weren't on the list. They weren't interrogated. They were rejected because their names weren't the people that the army wanted to see. So if he had gone, it's speculation. Nobody said, well, if you come, we're going to torture you. But the – his understanding, his fear, his feeling that this was a threat, was that if he had gone, he would have been, as you say, interrogated, beaten, tortured. Can you address – we take our questions taking somewhat over your time. Can you address real quickly the issue of changed country conditions? Simply, Your Honor, the government did not prove – show by a preponderance of the evidence that the country conditions had changed. They had signed peace agreements. However, the – even the evidence submitted by the government showed that the returning Guatemalans had been massacred, that they were slowing the returns because they felt that they couldn't just ensure the returning's safety, that the army was continuing to view people who returned as suspected guerrillas, and that, in short, impunity continued to reign in Guatemala. That's supported by the evidence submitted by the government. It doesn't rebut the showing that country conditions had sufficiently changed in 1998. Thank you. Thank you. Good morning, Your Honor. My name is Larry Cody. I represent the respondent in this case, John Ashcroft, the Attorney General of the United States. Petitioner's undisturbed resettlement in Mexico makes him statutorily ineligible for asylum. It's a presumption, right? Yes, Your Honor. And is it the government's position it was – the presumption was not rebutted? That's correct, Your Honor. Tell us why. There's no indication, Your Honor, from the record that Mr. Hernandez-Garcia's stay in Mexico was restricted. His rights weren't being violated. He wasn't forced to leave. He made the choice of not participating in the program that the Mexican government had set up. People were allowed to – and a camp was established for refugees of Guatemala. He chose not to go there. He chose not to go there because he didn't want to be under the rules that Mexico had set up for people who were staying at that camp. He wanted to be able to – He became, in effect, an illegal alien in Mexico. Not his own choosing, Your Honor. Correct. Does it matter whether it's his own? I think it does, Your Honor. I don't think – I don't think the regulations require that, you know, the Mexican government go to each individual person and say, here, we're offering you to be a refugee. Take this. I mean, he made the choice. Well, the service's own regulations point to a laundry list of factors to determine firm resettlement. Does he meet any of those factors? Your Honor, the laundry list – Was not granted lawful permanent resident status in Mexico or its Mexican equivalent, correct? That's correct. And that's not required for firm resettlement, Your Honor. He was not able to – he didn't have papers to come and go? That's correct, Your Honor. In fact, if he had left and come back and been stopped at the border, he would have had no lawful permission to enter Mexico. That's correct, Your Honor. But, again, that's by his own choosing. Had he gone to this refugee camp, he would have had more status than he chose to have. He chose to remain illegally in the country outside of the rules of this refugee camp. How is he different from an undocumented worker in this country? He's different, Your Honor, in that there's a program set up in Mexico for these refugees that he could have availed himself. Just like any other person who comes to this country could avail themselves of our immigration laws. Was he ever part of it? He was not. He chose not to be a part of it. In fact, his family members were a part of it. His testimony in here is that his brother was a member of the camp, Your Honor, and had papers to work and travel in Mexico to work. So he entered Mexico illegally under Mexican law, correct? I'm not sure, Your Honor. I'm not sure if the refugee camp was set up. There's no evidence that he entered Mexico legally. Okay, Your Honor. And the only evidence there is that there was this refugee program recognized by the Mexican government, which he refused to be a part of. That's correct. And he lived away from that refugee camp for 12 years with no authority to work, vote, go to school, own property, and he couldn't leave the country and reenter because of his status. That's correct. And how is he different from an undocumented worker in this country? Because, Your Honor, he had the opportunity to get some status and at least to be a participant in the refugee program. He chose not to. Because he could have legalized his status with the Mexican government, that is a factor in determining whether he firmly resettled? I think it's a factor, Your Honor, in discussing whether or not, as this laundry list we were talking about before contemplates, whether or not his conditions were so restricted by the government to lead to the conclusion that he didn't firmly resettle there. We get firm resettlement cases from time to time, and they typically involve someone who's gone to a third country and works there and comes and goes and has certain rights. But this guy doesn't sound like that. Even, Your Honor, if, you know, although he doesn't have travel documents to go back to Mexico and could not probably legally enter that country, this Court's decision in Vang is analogous, where an individual travels from France where they were firmly resettled in France. The travel documents expire upon arrival in the United States, so they have no travel documents to legally go back to France, yet this Court still determined that they firmly resettled under the statute. In France? In France. And what was their status in France in that case? The government's not sure, Your Honor. I can certainly brief that back to the Court. Because one of the cases, I don't recall the name, the individual received French citizenship. I'm not sure, Your Honor, if that was Vang or not. Okay. And, Your Honor, to briefly discuss before my time runs out, this here today is the first time that Petitioner's Counsel has discussed or argued the well-founded fear determination by the immigration judge. And the government submits in its brief that this issue has been waived to this Court. The only issue before this Court is, again, the firm resettlement issue and whether or not Petitioner, in this case, is entitled to asylum based on past persecution alone or humanitarian asylum. And the government concedes that there's nothing in the evidence. If this Court were to conclude that Petitioner had not firmly resettled in Mexico, despite the 12-year undisturbed presence there, that he nonetheless failed to make a case that the circumstance of his case compels any sort of discretionary grant of humanitarian asylum. Further questions, Your Honor? And the government would submit on a brief question. I'm certainly glad to see you're not as shaggy as previous government. Yes, sir. In the United States, Your Honor, we tend to keep it a little closer than the United States. This is going to be a fun plane ride home. Yes, sir. Ms. McDermott, I have a question for you in any event, if you wouldn't mind stepping up. What's your response to the government's argument on well-founded fear? Because I just looked at your brief and it looks to me like that's not in there. That's because it was already cited by the immigration judge. The judge found that, in conclusion, this Court would find that the Respondent suffered past persecution in terms of his affiliation to it. So is that the point? That's not the point I'm trying to address. You certainly raise past persecution. His point is that you didn't raise in your briefs before this Court well-founded fear of future prosecution. It's because the government didn't rebut the finding of past persecution, and past persecution raises the presumption of future persecution, which they did not rebut. Okay. Also, Your Honor, Respondent at the – in the administrative record at page 87 and 854 are the two pages or the beginning of the two letters which show that Petitioner was not firmly resettled in Mexico. And they say that he could not have been. He also testified several times to the restrictions that he felt that he would face in the camps. And finally, in Vang, the Laotian who had spent 12 years in France argued that his French travel document had expired after he entered the United States, so he might not be allowed to return to France. It's different because Mr. Vang got travel documents from France. Mr. Hernandez-Garcia never had that opportunity. So it is different because Mr. Vang was firmly resettled because he met the government's laundry list and the regulations that he had travel documents and was permitted to come and go, unlike this Petitioner who never had such rights. But you don't dispute that if he had gone to the refugee camp, he could have stayed there forever. Well, Your Honor, that's the – in the Certified Administrative Records, page 87, they say that that's not true. And they say that the camp was set up simply to control, on page 89 of the Administrative Records, paragraph 7, they say that this was – the camp refugees were registered primarily in order to control their movements and activities in Mexico, and that – So where are you reading from? Paragraph 7, page 89. What about paragraph 7? Camp refugees. You're reading from the beginning of the paragraph? Yes. Okay. Go ahead. And while the camp refugees were registered by the COMAR, which is a Mexican government organization that's stated earlier on in the letter, primarily in order to control their movements and activities in Mexico, and although they did receive a nonresident visa, which allowed them to work as agriculture workers, this document had to be renewed on a yearly basis depending on the goodwill and discretion of the authorities in charge at the moment. On several occasions, refugees remained undocumented for months or even years when their visa expired. In other situations, authorities abused their authority and took advantage of the vulnerable position of the Guatemalans. The immigration or COMAR – What are you reading from? This is a letter from a nongovernmental organization called Sin Fronteras. It's from the executive director, and it was written on May 4, 1999. It begins on page 87. There's also a letter from the U.N. High Commission on Refugees specifically about Mr. Hernandez-Garcia stating that they did not believe that he was firmly resettled in Mexico, and that letter begins on page 854 of the record, Your Honor. Okay. Thank you. Thank you. All right. Thank you. The matter will stand submitted, and that concludes this session of the court, and we'll recess until 9 a.m. tomorrow morning. Thank you. All rise. Nothing special about that. The bottle. Hey, could you use one for us, please? Take one? Yeah, you could. I was thinking you should take at least the open one. But, yeah, no harm in taking the open one, too. Okay. What are you going to do with the open one? I'll drink it. Do you have... I can take it. No, never mind, I'll just take it, yeah. Just take it. Yeah. Yeah. Yes. As long as I can. Yes. So we can just give people the bottle. All right. Well, I'm just, I didn't know, you were going to do your own standard? No. Okay. Yeah, I do my own. Okay.  I can't elaborate. Can you edit these from post, if you have time? I don't have time to do this, sir. Can I just get a little water? You know the movie that's coming out soon? Yeah. Oh, yeah. Okay. Yeah. All right. Well, I'm just going to try it if I don't know. Okay. Stay in the moment. Stay in the moment. Okay. Thank you. Bye-bye. Bye-bye. Bye-bye. Bye-bye. Bye-bye. Cool.    Bye-bye.  Bye-bye. See you next time, everyone.  Bye-bye. Bye-bye. Bye. Thank you. Bye-bye. Bye-bye. Bye-bye.
judges: Pregerson, Kozinski, Hawkins